IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86159-0-I |
| Respondent, | DIVISION ONE |
| v. | ORDER DENYING MOTION FOR RECONSIDERATION AND ORDER WITHDRAWING AND SUBSTITUTING OPINION |
| MICHAEL TIMOTHY O'BRIEN, | |
| Appellant. | |

Respondent, State of Washington, filed a motion for reconsideration of the opinion filed on December 29, 2025, in the above case and the appellant, Michael O'Brien, filed an answer to the motion. A majority of the panel has determined that the motion should be denied and that the opinion filed on December 29, 2025, shall be withdrawn and a substitute unpublished opinion shall be filed. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied and

ORDERED that the opinion filed on December 29, 2025, is withdrawn and a substitute unpublished opinion shall be filed.

FOR THE COURT:

_Díaz, J._

_____, ACJ

_Mann, J._

FILED
2/9/2026
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

MICHAEL TIMOTHY O'BRIEN,

Appellant.

No. 86159-0-I

DIVISION ONE

UNPUBLISHED OPINION

DÍAZ, J. — A jury convicted Michael Timothy O'Brien of unlawful firearm possession, eluding a police vehicle, and residential burglary. O'Brien now claims that the trial court violated his right to be free from double jeopardy when, after granting a mistrial because the assigned prosecutor contracted COVID-19, it permitted a retrial. He also argues that the jury had insufficient evidence to convict him of residential burglary because the garage he entered was not legally a "dwelling." Finally, the court declined to grant O'Brien a mental health sentencing alternative (MHSA) and a mitigated sentence below the standard range, which O'Brien now challenges. We affirm O'Brien's convictions and sentence.

I.      BACKGROUND

On November 28, 2020, a Snohomish County Sheriff's Office deputy observed a car being driven erratically and attempted a traffic stop. The driver did

not pull over and a high-speed chase ensued. Gunshots came from the vehicle during the chase. The car eventually crashed into bushes in a residential neighborhood and a man emerged and ran from police. While police were searching for the driver, an occupant of a house in the neighborhood called 911 to report a burglary in progress. Police went to the house and arrested O'Brien in the garage of that reporting witness, L.R.

Police found a purse and wallet belonging to Brittany Matkins inside of the car, although they did not locate her at the scene of the crash. Later, Matkins was arrested on a separate warrant. While in custody, police interviewed her about the incident with O'Brien. At first, she denied involvement. After Detective David Fontenot informed her that she could be charged for the incident, she admitted she was involved. Matkins agreed to testify against O'Brien as part of a plea deal.

The State charged O'Brien with assault in the second degree, residential burglary, drive-by shooting, attempting to elude a pursuing police vehicle, and unlawful possession of a firearm in the second degree.

The court swore in a jury on August 17, 2021. On August 18, the trial prosecutor, tested positive for COVID-19. The parties agreed to recess for one week, until August 25. One week later, the prosecutor was still unable to try the case. She had become extremely ill and had been hospitalized. No other prosecutor was available to immediately take over. O'Brien argued that the State had reneged on its responsibility to immediately assign another prosecutor to the case when the trial prosecutor tested positive. The court ordered a mistrial, to which O'Brien objected.

When the State reset the matter for trial, O'Brien objected, claiming a second trial would violate his double jeopardy rights. The court reviewed the record from the first trial, determined a mistrial was properly granted, and overruled the objection.

At the new trial, Matkins testified that she drove the car while O'Brien shot the gun out the window. O'Brien sought to impeach Detective Fontenot based on misconduct he committed in unrelated matters. The court denied O'Brien's motion and prohibited him from impeaching the detective on that misconduct.

The jury convicted O'Brien of unlawful possession of a firearm, eluding a police vehicle, and residential burglary, while acquitting him of the other charges. At sentencing, O'Brien requested an MHSA or a mitigated sentence below the standard range due to several mitigating factors, including multiple mental health diagnoses. The court considered the mitigating factors and sentenced O'Brien to the lower end of a standard range sentence, but otherwise denied his requests. O'Brien timely appeals.

## II.    ANALYSIS

### A.    Double Jeopardy

O'Brien argues that the State created the need for the mistrial when it did not immediately assign another prosecutor to the case after the first one contracted COVID-19. He claims that the second trial therefore violates his right to be free from double jeopardy and that the conviction should be vacated. We disagree.

#### 1. Manifest Necessity

The Fifth Amendment to the United States Constitution and article I section

3

9 of the Washington State Constitution prohibit the State from twice putting a defendant in jeopardy for the same offense. U.S. CONST. amend. V ("No person shall... be subject for the same offence to be twice put in jeopardy of life or limb."); WASH. CONST. art. I, § 9 ("No person shall be . . . twice put in jeopardy for the same offense."). We review double jeopardy claims de novo. State v. Fuller, 185 Wn.2d 30, 34, 367 P.3d 1057 (2016).

After a mistrial, "retrial is constitutionally impermissible unless the trial terminated under circumstances amounting to 'manifest necessity.'" State v. Wright, 165 Wn.2d 783, 793, 203 P.3d 1027 (2009) (citing Gori v. United States, 367 U.S. 36, 368-69, 81 S. Ct. 1523, 6 L. Ed. 2d 901 (1961)). Manifest necessity exists where "'extraordinary and striking circumstances'" indicate to a court in the reasonable exercise of its discretion that the "'ends of substantial justice cannot be obtained without discontinuing the trial.'" State v. Jones, 97 Wn.2d 159, 163, 641 P.2d 708 (1982) (quoting State v. Bishop, 6 Wn. App. 146, 150, 491 P.2d 1359 (1971)).

We review questions of manifest necessity for abuse of discretion. State v. Eldridge, 17 Wn. App. 270, 276–77, 562 P.2d 276 (1977). A trial court abuses its discretion if "its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." State v. Lord, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). We give the trial court's finding of manifest necessity "the highest deference." State v. Graham, 91 Wn. App. 663, 670, 960 P.2d 457 (1998).

In determining whether there is manifest necessity for a mistrial, the court must consider: "(1) whether the court 'act[ed] precipitately . . . [or] gave both

defense counsel and the prosecutor full opportunity to explain their positions'; (2) whether it 'accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding'; and (3) whether it considered alternatives to declaring a mistrial." State v. Melton, 97 Wn. App. 327, 332, 983 P.2d 699 (1999) (alterations in original) (footnotes omitted) (quoting Arizona v. Washington, 434 U.S. 497, 515-16, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978)). We have held that manifest necessity for a mistrial could reasonably found when due to illness, the court would have to otherwise delay the trial "well beyond the limits set by jurors during voir dire." Id. at 334.

Applying the three-part Melton test to the totality of the circumstances, we hold that the trial court did not abuse its discretion. 97 Wn. App. at 332. The court first asked to hear from both sides regarding the double jeopardy issue, giving "both defense counsel and the prosecutor full opportunity to explain their positions." Id. The court next weighed O'Brien's "interest in having the trial concluded in a single proceeding" and his right to have his chosen jury hear the matter against the disadvantages to O'Brien of another long recess. Id. Third, the court also considered alternatives to a mistrial. Id. The only alternative to a mistrial that the court saw was another extended recess, but it had concerns that more illness or unforeseen unavailability would further disrupt the trial. It also noted that, due to the many uncertain factors around party and jury availability, attempting to resume with the same jury after another long recess "may ultimately work to Mr. O'Brien's disadvantage."

On this record, we cannot conclude that these reasons were "manifestly

5

unreasonable or exercised on untenable grounds or for untenable reasons." Lord, 161 Wn.2d at 283-84. And, thus, we conclude there was no abuse of the court's "highest" discretion. Melton, 97 Wn. App. at 332: Graham, 91 Wn. App. at 670.

O'Brien argues that Melton is distinguishable because, in that case, it was defense counsel rather than the prosecutor who fell ill and prevented the trial from going forward. In such a situation, he contends we should instead apply a test articulated by the Connecticut Supreme Court, which held that, "a court properly exercises its discretion in declaring a mistrial when a prosecutor becomes seriously ill during trial such that he requires a lengthy absence, *and no other prosecutor is able to step in to resume the trial within a reasonable period*." State v. Anderson, 295 Conn. 1, 17, 988 A.2d 276 (2010) (emphasis added).

O'Brien emphasizes that the day following the prosecutor's COVID-19 diagnosis, a representative from the prosecutor's office told the court, "If it becomes clear in the interim . . . sooner rather than later . . . that we don't have confidence [that [the trial prosecutor] will be available,] there should be sufficient time to have another [Deputy Prosecuting Attorney] up to speed." O'Brien argues that, based on this "promise[]," another prosecutor was able to step in to resume the trial. He contends the court should therefore find that the court abused its discretion in "not recognizing this" fact and declaring a mistrial.

Without resolving whether the State "promised" anything or the record supports the claim that another prosecutor could have tried the case with a week's preparation, we decline to adopt what may be Connecticut's test for a mistrial due to illness. It is true that illness on the part of defense counsel, as was the case in

6

Melton, is a factual difference from illness of the prosecutor in this case. 97 Wn. App. at 329. However, we do not interpret the three-part test in Melton as applying only to illness of defense counsel. Indeed, since Melton was decided, Washington courts have applied the Melton test to fact patterns that do not involve illness at all. See, e.g., State v. Robinson, 146 Wn. App. 471, 479-80, 191 P.3d 906 (2008) (applying the three-part Melton test to a mistrial due to bailiff and juror misconduct).

We therefore hold that, under the Melton test, the trial court did not abuse its discretion in finding manifest necessity for a mistrial.

2. Negligence or Bad Faith

O'Brien next argues that, even if there were tenable grounds for the court's finding of manifest necessity, the State "create[d] the basis" of the manifest necessity and "caused the mistrial," and, thus, double jeopardy bars retrial.

Manifest necessity does not allow a new trial to go forward if the necessity is caused by negligence or bad faith. Graham, 91 Wn. App. at 670. "Negligence can negate manifest necessity if there is an alternative solution to the problem created. If there is no alternative to cure the situation, we then examine the acts of the court and prosecution to see if there is bad faith. If there is no bad faith, then the court's finding of manifest necessity is accorded the highest deference and is not an abuse of discretion." Id.

Whether a prosecutor is negligent or acting in bad faith is a fact intensive decision that "involves numerous factors to be weighed on a case-by-case basis." State v. Sisouvanh, 175 Wn.2d 607, 621, 290 P.3d 942 (2012). The trial court is in a better position than the appellate court to make such a determination. Id.

7

Based on the facts reviewed above, we cannot conclude that, after the prosecutor was hospitalized with COVID-19, there was an alternative other than declaring a mistrial. The only possible alternative cure raised at trial was another extended recess, which the court did consider but ultimately decided was too uncertain and therefore not a viable option.

And O'Brien makes no allegation of bad faith in either of his briefs. Counsel falling ill in is not the same as the government creating the basis for the mistrial as in, for example, State v. Juarez, cited by O'Brien, where "compelling discovery violations by the State left insufficient time for the defense to meet damaging new evidence within the speedy trial period." 115 Wn. App. 881, 883, 64 P.3d 83 (2003). Thus, this argument fails.

In response, O'Brien contends that this case is similar to Downum v. United States in that the State "took a chance" by not finding a replacement prosecutor immediately and is responsible for the consequences. 372 U.S. 734, 737, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963). But in Downum, the State agreed to the court empaneling the jury, even though the State was not sure before trial whether it would be able to proceed. Id. More diligent preparation or a continuance before swearing in the jury were options in Downum, but not in this case. The prosecutor in O'Brien's trial did not test positive for COVID-19 until after the jury already was empaneled.

Thus, without evidence of negligence or bad faith, we again must give the trial court's finding of manifest necessity "the highest deference." Graham, 91 Wn. App. at 670. Therefore, this assignment of error fails.

B.      Definition of a "Dwelling"

O'Brien next argues there was insufficient evidence to support his conviction for residential burglary because the garage that he was arrested in was not a "dwelling" under RCW 9A.04.110(7).  We disagree.

A person is guilty of residential burglary if they unlawfully enter or remain in a dwelling with intent to commit a crime.  RCW 9A.52.025.  A "dwelling" is any building or structure, or portion thereof, which is used or ordinarily used by a person for lodging.  RCW 9A.04.110(7).

"[W]hether a building constitutes a 'dwelling' under [RCW 9A.04.110(7)] cannot always be determined as a matter of law."  State v. McPherson, 186 Wn. App. 114, 118, 344 P.3d 1283 (2015). Sometimes, "the issue of whether an unoccupied [structure is] a dwelling [is] a question of fact for the jury to decide based on all the relevant evidence."  Id. at 118-19.  In that situation, the test for determining the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the essential elements of a grime beyond a reasonable doubt."  Id. at 117 (quoting State v. Rose, 175 Wn. 2d 10, 14, 282 P.3d 1087 (2012)).  And, "[w]hen the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.  A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."  State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

This court has held in various cases that spaces that are part of a larger

9

building used for lodging are a portion of the dwelling, even if the space itself is not used for lodging. See, e.g., McPherson, 186 Wn. App. at 115-19 (holding that a rational jury could find that a ground-level jewelry store was, as an issue of fact, part of a dwelling because there was an occupied apartment above it and the only way to access the apartment was through the jewelry store); State v. Neal, 161 Wn. App. 111, 112-15, 249 P.3d 211 (2011) (holding that a tool room inside a residential apartment building was a portion of a dwelling).

Closer to the facts here, because an attached garage is a portion of a building used for lodging, it falls within the statutory definition of a dwelling. State v. Murbach, 68 Wn. App. 509, 513, 843 P.2d 551 (1993). The portion does not have to be accessible from inside the living space to be part of a dwelling. State v. Moran, 181 Wn. App. 316, 323, 324 P.3d 808 (2014) (utility access area).

Here, at least three facts adduced at trial provide support for the jury's conclusion that O'Brien entered a dwelling. First, a bedroom within L.R.'s house shares a wall with the garage. Second, a room on the second floor partly extends over the garage. Indeed, O'Brien conceded at oral argument that the garage and the house share "a wall and maybe part of a roof." Wash. Ct. of Appeals oral argument, State v. O'Brien, No. 86159-0-I (Oct. 29, 2025), at 20 min. 42 sec. through 20 min. 47 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025101171/?eventID=2025101171. Third, the garage is connected to the structure of the residence, such that, on the night of the incident, L.R. heard the electric garage door open from inside the residence.

10

It is true that there was testimony that colloquially characterized the space as a "detached garage," and that L.R. testified that no indoor passage connects her residence to the garage. But, neither piece of evidence undermines the long-held legal principle that, "when there is substantial evidence, and when that evidence is conflicting or is of such a character that reasonable minds may differ, it is the function and province of the jury to weigh the evidence, to determine the credibility of the witnesses, and to decide the disputed questions of fact." State v. Theroff, 25 Wn. App. 590, 593, 608 P.2d 1254 (1980), aff'd, 95 Wn.2d 385, 622 P.2d 1240 (1980).

Thus, we conclude that there is sufficient evidence in the record to conclude that the garage was a portion of L.R. dwelling under RCW 9A.04.110(7).

In response, O'Brien relies on State v. Wixon, 29 Wn. App. 2d 675, 680, 542 P.3d 162 (2024), which held that a fenced backyard that abutted a house was not a dwelling for purposes of residential burglary. He argues that like the backyard in Wixon, L.R.'s garage abutted the house but was not part of a dwelling. This argument is unpersuasive.

In Wixon, Division Three of this court held that the yard was not a dwelling because a dwelling is a "*building* . . . used [primarily] for lodging. 29 Wn. App. 2d at 682 (emphasis added). Specifically, the court held that the legislature intended that courts apply the ordinary meaning of "building." Id. at 685. The ordinary meaning of "building" is a "secured area enclosed by walls and a roof." Id. at 682 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 292 (1993)). Therefore, the backyard was not a dwelling as a matter of law. Id. at 685.

Unlike the backyard in <u>Wixon</u>, the L.R.'s garage was enclosed by four walls and a roof and so falls within the ordinary meaning of a "building." The reasoning in <u>Wixon</u> does not otherwise apply to this case. And the claim fails.

C.      Evidence of a Witness's Untruthful Misconduct

O'Brien next claims that the court erred when it did not allow him to cross-examine a detective about his prior untruthful conduct for purposes of impeachment. O'Brien claims that this was both an evidentiary error under ER 608(b) and a constitutional violation of his Sixth Amendment right to present a defense. See U.S. CONST. amend VI. We disagree with both.

Detective Fontenot was the detective who interviewed Matkins when she changed her story and admitted involvement in the alleged crime. O'Brien sought to introduce evidence of three instances of Fontenot's untruthfulness, which he asserted were relevant to his case. While executing a search warrant in 2005, Fontenot took a pair of goggles without logging them into evidence. The same year, Fontenot signed a sworn return of service that listed an incorrect date. During a 2019 case, he lost a map created during an interview with a defendant and then admitted that he provided only a portion of other evidence to the defense counsel. The court ruled that Fontenot could not be impeached using these instances of alleged untruthfulness.

We review Sixth Amendment claims using a two-part test. <u>State v. Jennings</u>, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). We first review the trial court's evidentiary rulings for abuse of discretion. <u>Id.</u> "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds,

or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). "A trial court abuses its discretion if it improperly applies an evidence rule." State v. Nava, 177 Wn. App. 272, 289, 311 P.3d 83 (2013). If we conclude that the evidentiary rulings were not an abuse of discretion, we then consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. Jennings, 199 Wn.2d at 59. We address each in turn.

### 1. Evidence Rule 608(b)

O'Brien argues that the court abused its discretion because it took on the jury's role when it decided that Fontenot's "lack of judgment" did not indicate that he was untruthful in this case. We disagree.

In exercising its discretion under ER 608(b), the trial court considers "whether the instance of misconduct is relevant to the witness's veracity on the stand and whether it is germane or relevant to the issues presented at trial." State v. O'Connor, 155 Wn.2d 335, 349, 119 P.3d 806 (2005). Admission of specific instances of credibility evidence is "'highly discretionary under ER 608(b).'" State v. Lee, 188 Wn.2d 473, 488, 396 P.3d 316 (2017) (quoting State v. Kunz, 97 Wn. App. 832, 859, 988 P.2d 977 (1999)). "[N]ot every instance of a witness's (even a key witness's) misconduct is probative of a witness's truthfulness or untruthfulness under ER 608(b)." O'Connor, 155 Wn.2d at 350.

The court heard Fontenot testify about the incidents and found that he showed "lack of judgment" but no intention to deceive. The court therefore did not find the evidence was probative of untruthfulness for purposes of ER 608(b). The court ruled that these instances showed that Fontenot is "sloppy and hasty" in

13

handling evidence, but that evidence of sloppiness was not probative, particularly since all the evidence he had collected was already admitted by agreement.

O'Brien claims that, even though the evidence Fontenot had collected had already been admitted, impeaching Fontenot could have caused the jury to weigh that evidence differently. But it is the court's role to determine whether a witness' past misconduct is not only relevant to the witness's veracity on the stand, but germane to the issues at trial. O'Connor, 155 Wn.2d at 349. O'Brien makes no showing that ties Fontenot's prior behavior to any issue in this case. It is within the court's discretion to decide that the misconduct is not probative.

"Failing to allow cross-examination of a state's witness under ER 608(b) is an abuse of discretion if the witness is crucial and the alleged misconduct constitutes the only available impeachment." State v. Clark, 143 Wn.2d 731, 766, 24 P.3d 1006 (2001). There is no dispute that Matkins herself was a crucial witness. O'Brien claims that Fontenot was also a crucial witness because his interrogation led to Matkins' testimony, which placed the gun in O'Brien's hands. We disagree.

The transcript of the interrogation was produced as an exhibit during the trial and so there was no dispute about what was said in the interview. O'Brien referenced it multiple times during Fontenot's cross-examination. But O'Brien did not claim that Fontenot had done anything improper or illegal in the interrogation with Matkins.

The jury could have reasonably convicted O'Brien using Matkins' testimony and interrogation transcript. O'Brien points to no unique part of

14

Fontenot's testimony that went to any element of the alleged crimes. Moreover, O'Brien does not attempt to show that the alleged misconduct constitutes the only available impeachment. See Clark, 143 Wn.2d at 766-67.

We conclude the trial court did not abuse its discretion.

2. Sixth Amendment Right to Present a Defense

If we find no abuse of discretion on the evidentiary ruling, we then review for any Sixth Amendment violation. Jennings, 199 Wn.2d at 59. This second step of the analysis does not allow an appellant to do an end run around the Rules of Evidence. State v. Ritchie, 24 Wn. App. 2d 618, 629, 520 P.3d 1105 (2022). It requires this court to make sure that "both parties receive a fair trial." Id. at 634. We must therefore examine "whether there is a unique or aberrant rule that results in the defendant having a lesser Sixth Amendment right[.]" Id. at 629.

The court notes that O'Brien has rights enumerated in the confrontation clause. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

In determining whether a trial court violated a defendant's right to confront a witness by limiting the scope of cross-examination, we apply a three-part test:

> First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be

> balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld.

Lee, 188 Wn.2d at 488 (quoting State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002)). If the evidence is highly probative, no state interest is sufficient to preclude cross-examination. Id. "[T]he more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, [or] credibility." State v. Orn, 197 Wn.2d 343, 354, 482 P.3d 913 (2021) (quoting Darden, 145 Wn.2d at 619). If the defendant can "achieve through other means the effect that the excluded examination allegedly would have produced is a factor indicating that his right to confrontation was not violated." Ritchie, 24 Wn. App. 2d at 635 (quoting United States v. Drapeau, 414 F.3d 869, 875 (8th Cir. 2005)).

On de novo review of the record, we agree with the court that the instances of Fontenot's misconduct have low probative value of Fontenot's untruthfulness. Ritchie, 24 Wn. App. 2d at 627. Even if the misconduct were minimally relevant, the State has an interest in preventing three mini-trials on misconduct allegations that could confuse and unfairly prejudice the jury. See State v. Caril, 23 Wn. App. 2d 416, 432, 515 P.3d 1036 (2022) (holding that relevant evidence was properly excluded when its admission would "lead the jury into . . . irrelevant issues.").

Given that the nexus of any alleged crucial role in the case was Fontenot's interrogation, and O'Brien used the transcript of the interrogation during his cross-examination, O'Brien's claim that he was denied a fair trial is unpersuasive. This assignment of error fails.

D.     <u>Issues on Sentencing</u>

16

Finally, O'Brien argues that the court abused its discretion when it declined to order an MHSA sentence and imposed a standard range sentence despite noting some mitigating factors. We again disagree.

"A defendant is eligible for the [MSHA] if: (a) The defendant is convicted of a felony that is not a serious violent offense or sex offense; (b) The defendant is diagnosed with a serious mental illness recognized by the diagnostic manual in use by mental health professionals at the time of sentencing; (c) The defendant and the community would benefit from supervision and treatment, as determined by the judge; and (d) The defendant is willing to participate in the sentencing alternative." RCW 9.94A.695(1).

The trial court's decision whether to grant an alternative sentence is reviewed for abuse of discretion. See State v. Osman, 157 Wn.2d 474, 482, 139 P.3d 334 (2006). Although no defendant is entitled to an exceptional downward sentence or sentencing alternative, every defendant is entitled to request the sentencing court to consider such a sentence. State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). A trial court abuses discretion when "it refuses categorically to impose an exceptional sentence below the standard range under any circumstances." Id. (quoting State v. Garcia–Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997)).

Here, the court considered the prongs required for the MHSA and found that O'Brien was (a) not convicted of a felony for a serious violent offense or sex offense and (b) was diagnosed with a mental illness. On the record, O'Brien expressed a willingness to participate, as required by RCW 9.94A.695(1)(d). However, the court

was unconvinced that the defendant and the community would benefit from supervision and treatment, rather than incarceration.

The court noted that when O'Brien committed the crimes in this case, he was in a different alternative sentencing program. The court also noted that while awaiting sentencing in this case, he had been arrested and charged with another felony. The court was not persuaded that O'Brien would take the MHSA program seriously and benefit himself or the community. The court therefore did not order the MHSA. On those facts, we cannot find the court abused its discretion in declining to grant the MHSA.

In the alternative, O'Brien alleges that the court erred when it did not order a sentence below the standard range due to mitigating factors. The decision whether to impose a lower sentence for mitigating factors is also reviewed for abuse of discretion. See State v. McFarland, 189 Wn.2d 47, 52, 399 P.3d 1106 (2017) (quoting RCW 9.94A.535) ("a court 'may impose a sentence outside the standard range for an offense if it finds . . . there are substantial and compelling reasons justifying an exceptional sentence.'"). "When a court has considered the facts and concluded there is no legal or factual basis for an exceptional sentence," that ruling is within the court's discretion. State v. McGill, 112 Wn. App. 95, 100, 47 P.3d 173 (2002).

The court did find mitigating factors, including those arising from O'Brien's psychological assessment. The court also noted that the jury had found an aggravated factor for the burglary charge since R.L. was in the residence at the time of the burglary. The court imposed a sentence at the low end of the standard

range because of the mitigating factors but found the factors insufficient to support a sentence below the standard range.

We conclude that the court did not abuse its discretion. The court did not categorically refuse the lower sentence. <u>Grayson</u>, 154 Wn.2d at 342. The court expressed that this was a difficult sentencing decision. The record indicates that the court meaningfully considered both the MHSA and the lower sentence. It simply found that neither option was supported by the facts of this case. <u>McGill</u>, 112 Wn. App. at 100. On such a record, there is no abuse of discretion.

III.  <u>CONCLUSION</u>

We affirm O'Brien's convictions and sentence.

Díaz, J.

WE CONCUR:

_____, ACJ    Mann, J.